v. Chris Mellen, Paul Mellen, et al., opposed by Angela Evans. My name is Angela Evans and I represent the few. We have 26 partners of the Watkins Enterprises Land Trust and Partnership Agreement. 21 of them are plaintiffs and 5 of them are my clients. I'd like to begin my discussion regarding how these proceedings began. We began with the creation of the Watkins Enterprises Land Trust and Partnership Agreement back in 1977. But particularly, this litigation started in 2012. You can look at page 7 of our reply brief as well as page 8 of the plaintiff's brief and see that more than half the partners indicated to the land trustee at that time that they would like to be bought out by the partnership for various personal reasons. That began all of this in 2012. Then, in 2013, we have some discussion amongst the partners, some negotiations. In 2014, we have our first lawsuit, not this one. The first lawsuit was a declaratory judgment action seeking authority for the land trustee to sell the land. The corpus of this trust is 450 acres in Marshall County. In that action in 2014, he's asking for permission to sell that land at public auction. That case went up on appeal. This case started during those proceedings. This one is asking for dissolution of the partnership. That's how we got here today, back in 2012, when half the partners wanted to be bought out. Then you say, why didn't they just do that? Why didn't we just buy them out at that point? Nobody went to the document that controls this situation, the Watkins Enterprises Land Trust slash Partnership Agreement, to try to decide that. Rather, we started seeing about, well, we're going to sell the land at auction and other provisions, as opposed to just looking at what controls. My clients are asking that this document be applied to these proceedings. If you look at paragraph 2.07, I'm looking at the Partnership Agreement and the Appendix of Defendant's Appellate on C-0140. You'll see that business is defined in quotation marks, capital B. Business means farming and related activities. Then you go on, I'm just highlighting the things I think are pertinent out of this document, to paragraph 2.20 on C-141. It states that partnership means the association of two or more persons as partners under the terms of this agreement to carry on as co-owners. The business, capital B, referring to the other defined term, business means farming and related activities. The business, for profit, which relationship shall be automatically created during the period in which there is more than one shareholder? Sorry, I'm going to try to wake you up in a second. Section 3.02, the partnership shall engage in the business, capital B, from the partnership office. Then we have a provision. All of those I highlight to you because those are, in the very front matter, talking about the business of this entity. The business of this land trust partnership agreement is farming and related activities. We'll get into this later, but know there's no defined purpose stated there, but it does say the business purpose. The partnership shall engage in, I went over that one, 3.06, no partner may be expelled from the partnership. I highlight that provision because it places an emphasis on what the grantors wanted to happen in this trust. Nobody was going to get tossed easily. Then we come over to section 7.01, and it states, except with respect to a transfer to permitted holder, no transfer may transfer any shares to any person without transmitting an offer to both the partnership and the other partners. Basically, folks, if you want to buy out, you want to get out of this thing, you want to sell your shares, you are supposed to offer them to the partnership. Then it goes and explains how you base the price, and it gets into a lot of detail. You're supposed to offer it to the partnership, and if they don't want it, to the other partners, before you can go and transfer your shares wherever else. What was granted in the motion for summary judgment that we're on appeal on here is not only the dissolution of the partnership, but also the sale of the land at public auction. What began as the partners wanting to be bought out, they decided, well, we want to sell the land at public auction for whatever reasons, and now we have a total circumvention of what they could have done to get rid of their shares, and it's never happened. They never offered their shares to the partnership. They never offered their shares to the other partners in accordance with these provisions. Go over to termination. If you want to terminate the partnership, in section 9.01, it states, that the partnership reflecting this agreement shall terminate upon the first to occur of the bankruptcy, receivership, or dissolution of the partnership, or the written agreement of all shareholders. Yes, I represent the lone few, only five, but if you want to terminate the partnership, this agreement says all of them need to decide that. At the bottom of section 10.02 is an interesting provision. It states that the parties agree that irreparable damage would be done if any shareholder would bring an action in any court. It talks about arbitration, and then at the very bottom it says, you hereby waive and renounce the right to such a court decree of dissolution, or to seek the appointment of a liquidator for the partnership. It says you waive it. And then over in section 11.01, it talks about the power of the trustee. It says, the trustee shall act or admit to act upon written direction of the partnership. I highlight that just because there were a lot of things that happened in this case that didn't happen with written direction of the partnership. And finally, the last little note I'll highlight is that there is some discussion that this dissolution is necessary because there's so many of them. There's 26, and we're just going to have 26, and in the next generation we're going to have 40-something, and so on and so forth. But that's not true. In section 11.08, subparagraph H, there is a provision that says, the trust under this agreement shall terminate not later than 21 years after the death of the last survivor of the shareholders and the shareholders' descendants living on the execution date. That's the rule against perpetuities, isn't it? So what it means is it will terminate at some untold time thousands of years from now. Okay, well, I thought it meant it would terminate, and it had a special provision that when that happened it would terminate. But then it also, if that's the case, shows an emphasis of the grantors to try to make this endure. And that's an interesting point to look at as well. Here we have, I highlight all those things because my clients want the agreement to be followed. They would like, that is the contention at issue here, is that they believe that Article VII has been triggered and that it should be followed. That if the other partners want to be bought out, Article VII of the Partnership Agreement, titled Restriction Upon Transfer of Partnership Interest, should allow them to operate and control the issue we have here, where people are wanting out. So how has Article VII been triggered? Has a trigger event occurred? Article VII is triggered when a partner seeks to sell his shares to an unrelated third party. Here we have partners who wish to leave the partnership. They have not made an offer to the partnership in accordance with Section 701 to buy their shares. Has the partnership made an offer to them to buy the shares? No, but my clients have. And that actually, through part of the litigation, that actually came to the, I mean those negotiations are part of the record. On how, what offers was made. I mean there were offers made back in after 2012 through 2013 up to 2014 when finally it was just, let's just sell it at public auction. I noticed that this place had like a hunting lease. They entered into a hunting lease with somebody. And that generated how much money? I don't recall exactly. It's not, it wasn't a profound amount. I don't recall exactly how much. The main, there is a lease for the farmland. And there's cash rent still accruing. The farm is still rented. But this new hunting lease, the reason there's so much emphasis on the hunting lease is because the hunting lease was actually agreed to unanimously by the management committee. One of those people who sit on the management committee is one of my clients, Chris Mellon. And it was agreed to unanimously and it was a new business. So when you look under the provisions of the Uniform Partnership Act, 801 subsection 5, that says that whether or not the economic purpose has been frustrated, whether or not the business can continue, those sort of factors. The hunting lease is a prime example that not only is the farm still leased, not only is everybody still getting their paychecks, not only is the farm still operating and creating income as it always has, we've expanded our business. Is this a, well, okay, but doesn't it matter what you're getting paid for that farm lease? In other words, is this, if I own 400 acres of land and I've got a couple of duck hunters or deer hunters that want to give me a couple thousand dollars a year to shoot deer on the property and I don't know if it's a cash rent or a crop sharing situation, but is that, are you making any real money on that versus what you could do with the cash? If that was the argument, Judge, I would say that it was more in line with the factors that fall under section 801, but that's not the argument. There's not a shred of evidence in the record that this motion for summary judgment was granted on that says that this business is not producing enough. There's nothing that says it is operating at a loss. There's nothing that says that we're going to lose our farmer who farms this whole farm and we're not going to have any more income. There's nothing that shows a decline. That argument that you just made is valid, but that's not the argument. Sir? It was a question, not an argument. Well, I understand, but that was not there. Actually, the information that's in the record shows a healthy partnership. The offers that were made and negotiations back and forth, did they just stall based on a lack of reading of the minds as to the price? Well, the partnership agreement offers an appraisal process that is supposed to be followed. Nobody strictly adhered to those provisions, and so, yes, when everybody was just kind of negotiating, saying, well, this is what I think is fair, this is what I think is fair, no, I think we can get more public auction, things faltered. But the provision that sets the share price in that Section 7, as far as how you arrive at what that offer should be, actually talks about selecting an appraiser, and if you can't agree on an appraiser, then you have competing different appraisals. None of that was ever followed. Two minutes, please. The offers that were made were substantially less than any of the appraisals, weren't they? I don't believe so, Your Honor. I believe that especially the last offer, the most recent offer that was made, was the appraisal price, I believe, back in the last letter, I think. The one thing, in my last two minutes, that I wanted to offer to the Court is the policy and presidential value of what the decision today could cause. I am afraid that this case sets up a framework on very, very weak facts that circumvents partnerships agreements. I think that when you have termination provisions that are spelled out in the detail that this is, and that they're not followed when people want to leave a partnership, that we're going to have a lot of litigation when people just don't like each other and they go to the Court and say, well, I don't like what he's telling me, you just decide. Partnerships should not become divorces. We should not throw what people rest when they invest in their business, and they say, this is how things would proceed, so I'm willing to invest in this, or I'm willing to devote my life to this law partnership or whatever it is, because this is what's going to happen if somebody decides to exit. I think that the policy that would be created here would be so flippant that if you just don't like each other, you can go to the judge and see if you like how he's going to divide things up better, or she's going to divide things up better. And I don't think that's good law. And so I do think it's a very important case. I think that it would allow partners to circumvent exit procedures. Let me ask you about the flip side of that argument. Yes, sir. And that is that if, so you've got this land at a trust, and you say, I offer, and so some partner wants to offer, says, I'm going to offer my shares to you all, and so they're lowballing, they're offering virtually nothing. No one, okay, I'm not selling them for that, so then it goes out in the market and tries to sell somebody his share in that trust. Well, that person knows he or she is buying a lawsuit when they do it because what they've got to do, then they buy the property, and then they've got to go in and file a suit for a partition or whatever to get a hang of the land. So that devalues the interest in the thing. So that's not necessarily a great law either because the person can't sell their interest in that property at a fair value unless they find a real dummy, because that person is going to know they're buying a lawsuit when they buy that property if it's still in trust. Right, well, Your Honor, and I think that if you would protect this land from somebody buying a lawsuit if the provisions had been followed and then you try to sell it after, you know, if you offer it within the partnership and you follow the provisions that are set forth or you have the written direction of the partnership to the land trustee to sell the land at public auction, then you don't have a lawsuit. So I do think it goes back to you still, and, you know, the fear of the lawsuit and how that affects the market value of the business assets being sold and things, you know, I think it's a separate issue from how would you stalemate and slow down businesses and people working together and creating partnerships if there is no exit? I know for my own purposes, I'm a sole practitioner, and I often think about what's my five-year plan, what's my ten-year plan? This case has caused me great concern as to how things would develop and how exit strategies would go if a partner didn't want to stay in practice with me or if I wanted to leave. Would it be that I couldn't rely on the document that we set up? Would it be that somebody can just not like me and petition the court for judicial dissolution and because of the vagueness of those provisions and if a case like this, I think, would be so open-ended that you could then say, well, we're just not getting along. You've answered my question. Okay.  Thank you. Thank you, Ms. Williams. Ms. Nair? Thank you, Donna. May it please the court. Counsel. My name is Johnna K. Nair. I'm a counsel for the plaintiffs. I have with me today Lauren Christmas and a number of my clients, I think, are also here in the audience. I want to start where Ms. Evans left off. What do we do with a partnership when people want out of the partnership? I'm happy to tell you that the Uniform Partnership Act answers that question to an extent. Does the partnership agreement do it as well? It does, but the Uniform Partnership Act explicitly provides in Section 103B7 the partnership agreement may not vary the requirement to wind up the partnership in cases specified in Section 8015. So if we have a circumstance that falls into 8015, it is absolutely not subject to anything in the partnership agreement, first. Second, I want to focus on the partnership agreement. I think it's important and I agree with counsel on that point. Section 7 of the partnership agreement is not a buyout provision. It is not a provision where one of the partners can go to the partnership and offer up their shares to be bought out. That's not what it says. Section 7 addresses the circumstance where a partner wants to sell their shares to a third party, to a non-family member, they've received an offer. Offer is a capital O, offer. They've received an offer to purchase their shares by a third party non-family member. Before that sale can go through, the partner needs to offer the shares to the partnership. If the partnership doesn't trigger its right of first refusal, then they need to offer their shares to the rest of the partners. If those partners don't purchase it, then the would-be transferee who made the initial offer gets to buy the shares. I don't see where it says that they have to have an offer first. They have to make an offer to both the partnership and the other partners. It says except with respect to a transfer to a permitted holder. No transfer or may transfer any shares to any person without transmitting an offer. So they want to transfer to anyone else. Before doing so, they must make that offer to partnership, and if the partnership doesn't want it, then to the other partners. The definition of offer in Section 2.16 is a specific written undertaking. It's got five elements, one of which is the name, address, and telephone number of the proposed transferee. It presumes that there is a transferee who has made an offer to buy the shares, and that can be seen also in 7.03, where it says to the extent that neither the partnership nor the partners purchased the option shares, the transferor may transfer the option shares to the transferee if the transferee executes a counterpart of this agreement. So the trigger event is not simply a partner who wants out saying, Hey, partnership, buy me out. That's not really the event that we're talking about. What we're talking about is receiving an offer to purchase those shares at a price from a third party. The other trigger event is the death of a partner, and that's a, quote, trigger event under 7.04. And again, Your Honors, I don't want you to lose sight of the fact that this only is relevant if the circumstances in 8.015 aren't met. This provision cannot vary the requirement to wind up a partnership if the circumstances in 8.015 exist, and that's explicit in the law. So turning to the law, we have a number of material facts in this case that are not in any dispute, and I think that you heard a number of them from counsel. There is no stated purpose in the partnership agreement. The purpose is not to hold this particular piece of property for all of time for the great-grandchildren. It could have provided that. Many do. Many family-limited partnerships provide that the purpose of the partnership is to hold the property for the grandchildren and the great-grandchildren. The trustee, in fact, is specifically given the authority to sell property under certain circumstances. Those are not the subject of this case. But the trustee explicitly can sell the property or parts of the property at public or private auction and on terms as are seen to be just. So nothing prevents the sale of any piece of property under this agreement. Twenty-one out of the 26 partners, so 83% of the shareholders, believe that sale at public auction is the way to go to best effectuate the economic goals of the grantors. Five out of 26 of those partners, 17% of the shareholders, oppose the sale at public auction and instead claim that a 100% vote of all the partners is required to sell the real estate. Now, relationships among the partners, as you saw, have deteriorated to the point of no return in this case. There's shouting matches. Nobody wants to talk to each other. I can't imagine Christmas dinner. This is a family. It's too bad we're at this point, but we're at this point. And thank goodness the legislature has seen fit to give us an escape valve, and that escape valve is 8015. Some other points that are undisputed is that the public auction is really the only way that we will ever know for certain what the fair market value is. Appraisals are one thing. Actual sale truly determines what fair market value is. It is fair market value. It's offered for sale. It's fair market value. The appraisals that we received back in 2012 when the parties were still trying to work something out varied wildly. I think the highest was 40% more than the lowest, if I'm recalling the numbers off the top of my head well. Anywhere from $2 million to $3 million for one piece of property, and these are the appraisals taken roughly contemporaneously in the course of one year. So clearly, as we all know, appraisal is at least equal parts art and science, and the best way, and the only way at this point to really know what the property is worth is to sell it. Of course, Ms. Evans' clients have just as much right to appear at the auction and purchase as do my clients. Some of them might want to buy a parcel of this land, but that will fully and finally determine what the fair market value is. There are other equitable reasons to dissolve the partnership at this point, including the diffusion of shares. We're already at 26 partners. The practice in the family has been that a parent will pass the shares on to the children. We could be looking at 52 partners in the blink of an eye. The other point that is made is that the geography of the partners is getting more and more diverse. I think many of the partners do not live in Illinois anymore. The management of this entity is becoming more and more unwieldy. And then the final point that is a material fact that is not in dispute is the fact that the value of farmland is decreasing. When this suit was filed, we were at a peak. When the parties were considering selling the land at a public auction, we were at a peak, and I think that's been proven out over the last couple of years. We are being hurt. Our partners are being hurt by letting this go on and on and on. The Uniform Partnership Act provides for three circumstances, any one of which is a sufficient basis for judicial dissolution. The first is economic purpose of the partnership being frustrated. The second is where a partner is engaged in conduct that makes it not reasonably practicable to carry on the business in partnership with them. And the third is if it is not otherwise reasonably practicable to carry on the partnership business in conformity with the partnership agreement. And that's where we stand from the Partnership Act perspective. So any one of those three points is met and judicial dissolution is appropriate. On economic purpose, the first, again, there's no delineated purpose. They talk about business being farming. However, the sale of the particular property at issue is contemplated in the agreement. And the testimony and the affidavits from the clients, and I think they're undisputed, is that the purpose of the trust was to make as much value for the generation's following as they could. Twenty-one out of the 26 partners believe that the economic purpose of the partnership is best served through the sale of the property at this time, as soon as possible, frankly. The defendants, in contrast, have argued that the partnership agreement demands unanimous consent of every last share, every last partner, for all decision-making other than ministerial acts. And in fact, that was the basis in part for a complaint they filed against 21 of the partners, claiming they breached their fiduciary duties to the defendants by allowing the trustee to file a declaratory judgment action to determine the scope of his authority. So, they mean it, they really do think that unanimous consent of every shareholder is required for any decision-making other than a ministerial act. Again, because the value of the property is decreasing, the prejudice to the partnership and to the partners is increasing as the defendants continue to object to the sale. So, we do believe that the first of the three points under 8015 is met. Now, the second point, another partner is engaged in conduct relating to the partnership business, which makes it not reasonably practicable to carry on the business in partnership with that partner. We do believe that this one is also met. There is evidence that while they've argued that 100 percent vote is required to conduct major business, the defendants have actually not responded regularly to correspondence regarding the partnership. That's uncontested as to at least four out of the five defendants. Two of the defendants, Chris and Paul Mellon, have gotten into it, have antagonized the rest of the partners to such an extent that they won't all be in the same room together anymore. So, clearly, we believe that that second element or second basis is also present. Now, the third basis is maybe the one that is most applicable in this case. It is not otherwise reasonably practicable to carry on the partnership business in conformity with the partnership agreement. The question, again, is not whether it is impossible to carry on business, but whether it is not reasonably practicable. The affidavits have established that there's been an irreparable deterioration of a relationship between the partners, and that is recognized in the case law as a valid basis for dissolution. Fault isn't relevant per se under this element, but the plaintiff's uniform perception is that the defendants are attempting to leverage their willing to file litigation, they're attempting to leverage their 17 percent share to try to self-deal and get a better price for land than what the market would bear. There have been threats made against the auctioneer who was retained, against the trustee personally, to come to his place of business and to tell people that he's breaching his fiduciary duties. And there's actually been a lawsuit claiming punitive damages against the partners because they authorized the filing of a declaratory judgment lawsuit by the trustee. In terms of the logistics issues we discussed earlier, the pool of 26 partners is going to grow. The partners don't live in Illinois. This is yet just another reason why it is not reasonably practicable to continue on. And again, the law is clear that any one of those three bases would be sufficient to require a judicial dissolution. We think all three are present. Any one of them would have been sufficient, and that is what the judge found at the trial court. We did ask for judicial supervision because we don't want to do anything without the court telling us that it's okay. We want to take the auction materials to the court for approval. We want to take the offers that we receive to the court for approval. We want to take the identity of the appraiser to the court for approval, and he's already validated one appraiser subject to the trustee suggesting somebody else and receiving approval from the court. I think this is the perfect example of a case where judicial supervision is warranted and good cause has been shown. So we believe that the trial court did properly enter summary judgment in this case, and we would ask that the court affirm that decision. Thank you, Your Honor. Ms. Evans for rebuttal. A couple of things. First of all, these guys happen in the room together. They go to court every other month. The management committee has met, and they approved a hunting lease. I think it's remarkable that things have continued in the light of, and it's not just one lawsuit that Ms. Nair mentioned about the breach of fiduciary duties. That was actually voluntarily dismissed. The biggest issue there, well let me get back to my other point, but there's three lawsuits, and we're still making money. They're still somewhat getting along. I don't think that the facts that are stated here arise to what, we don't have a lot of precedent in Illinois to govern us on this issue of what the new statute says and what those 801 factors are, but if you look at some of the other foreign cases, not necessarily all of them are partnerships. Some of them that were cited by the plaintiff had to do with LLCs. Well, first of all, none of them had to do with after summary judgment. All those were after a trial or jury trial, but one of the cases, I believe it was a South Dakota case, does a remarkable job of summarizing what foreign jurisdictions have done and what they have thought would warrant dissolution under similar provisions. This is a uniform act that Illinois has adopted, and they're much more drastic than what we have here. Also, I remind you that this started back in 2012. Everything was fine. The whole start of this started in 2012 when partners wanted to be bought out for personal reasons. Now, again, you said you're making money. So how much money are you making? I know it's in our record. It's in the appendix materials. There were, I believe, submitted on that, but I don't know the number. I don't know. But I know that it is comparable to what they've gotten since 1977. I mean, it is not something that's dropped off. A very small portion of the property is a timber track. That's what's being leased out under the hunting lease, and the rest is tillable. So they are farming all of that, and the lease has continued. The other thing that I wanted to mention is just the drasticness of motion for summary judgment. We have two drastic remedies here. Motion for summary judgment and judicial dissolution altogether. Many questions of facts still remain, I believe. I think that it is a drastic remedy when the facts are not showing a complete stalemate. The tension that has arisen here has to do with when the land went to be sold at public auction. If you look at the affidavits, it all began when the land trustee didn't ask, it wasn't written approval of everybody to put the land up at auction like he's supposed to under the agreement. My client, Chris Mellon, contacted the auctioneer and said, please don't sell that property, or there may be litigation that follows because this isn't supposed to be going down this way. I don't think that was a bad thing. I think the auctioneer may appreciate that. Where would we be now if the land had been sold then with the trust corpus gone? It would be a nightmare. I think that that wasn't a bad deal to do that. That began the discord that's stated in the affidavits. The affidavits are a problem as well. A lot of the affidavits contain hearsay. They're not admissible evidence. I didn't get to cross-examine anybody about the value of this land. One of the issues that Ms. Nair just cited is that the value of the farmland is falling. That impacts the economic purpose. I understand that in Illinois you can admit evidence of a landowner's opinion as to the value of their property, but it's also assigned the weight that the person has based on their experience. That's what the case law says. It says based on that opinion of the market value. I didn't get to cross-examine these affidavits. This is a motion for summary judgment. I didn't get to talk to them about what their experience was, what they determined the market value falling would be based on, comparables in the area, and what they sold for. None of that information was in the record. We just have a general synopsis amongst them, conclusions that should not be affidavits. Conclusions of the affiance that the market price is falling. There are several reasons that I believe that the motion for summary judgment was erroneously entered. I appreciate everyone's time today. Any other questions? I don't see any. Thank you. Thank you all for your arguments here today. This matter will be taken under advisement and a written decision will be issued to you as soon as possible. Right now we will take a brief recess for panel discussion.